ELLIS GEORGE LLP
Eric M. George (State Bar No. 166403)
  egeorge@ellisgeorge.com
Todd M. Lander (State Bar No. 173031)
  tlander@ellisgeorge.com
David J. Carroll (State Bar No. 291665)
  dcarroll@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff Tessa Veksler

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TESSA VEKSLER,<br><br>        Plaintiff,<br><br>    vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; UNIVERSITY OF CALIFORNIA, SANTA BARBARA; and DOES 1 THROUGH 20,<br><br>        Defendants. | Case No. 2:25-cv-11745<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**1. Violation of 42 U.S.C. § 1983 (Equal Protection Clause)**<br><br>**2. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq.**<br><br>**3. Violation of 42 U.S.C. § 1983 (Free Exercise Clause)**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Trial Date:  None Set |

-1-
COMPLAINT

# **INTRODUCTION**

1.    Plaintiff Tessa Veksler ("Tessa") is a first generation American who has, through hard work, personal integrity and a devotion to inclusiveness and a determination to hear all voices, achieved both academic and personal success.  She was elected student body president at the University of California Santa Barbara (UCSB) in April 2023, and took the position in the spirit of the cultural pluralism that had defined her life.  But Tessa is also proudly Jewish and, by late 2023 had become the victim of repeated and systematic assaults and other abuse by a horde of antisemitic instigators on campus.  Tessa suffered this nightmare despite having repeatedly pleaded for help from UCSB administrators and representatives.  But her pleas fell on deaf ears.  And the assaults and abuse intensified, all with the full knowledge, consent, and even the active participation of one of the University's representatives.  UCSB refused to assist Tessa in protecting herself from these ongoing attacks and harassment, choosing instead to leave her to face the antisemitic mob alone – and increasingly vulnerable – for months on end.  Indeed, the University and its representatives actually made the situation worse, and the time has now come for UCSB to answer for its unspeakable complicity.

2.    The child of immigrants from the former Soviet Union in the 1990s, and the epitome of what our colleges and universities ought to celebrate, Tessa had, prior to her election, been a tireless advocate and promoter of on-campus inclusivity, and open dialogue, for diverse viewpoints pertaining to race, ethnicity, and religion. Tessa believed, as she began her term as student body president, that she would continue to use her voice to promote these views, as rooted in first principles of academic freedom and student free speech.  And in taking her oath of office in May 2023, Tessa committed not to act for any one faction of students, but for all, regardless of race or religion, and she did so believing that UCSB would take all necessary actions to foster an environment on campus in which Tessa could properly discharge these duties to her fellow students

3.     Then came October 7. Tessa, in response to those terrorist attacks, posted on social media a short, simple statement condemning the attacks on innocent Israelis.  She certainly decried the murder of innocents and the senseless violence of the attacks.  But in essence, she made clear that she stood "with my Jewish community/neighbors" and "with the people of Israel."

4.     Although not a word of her posts was directed at, much less critical of, Palestinians generally or the residents of the Gaza Strip specifically, Tessa  became the target of a months' long campaign – replete with assaults and threats of physical violence, harassment and intimidation, and cyberstalking and defamation  –by antisemitic agitators focused solely on Tessa's status as a prominent member of the UCSB Jewish community.  Over the course of months, and with increasing intensity and savagery, they proceeded to assault Tessa and heap other abuse on her.  Even Tessa taking a simple walk through the UCSB campus descended into an indulgence of that assault and abuse, with antisemitic crowds wielding blowhorns and screaming epithets and insults at her.

5.     And yet, as ugly and traumatizing as this conduct was, even more perverse was UCSB's complicity in it.  As Tessa remained undeterred in her conviction to carry out her duties as student body president, and as she sought despite these mounting threats to bring discourse and understanding to a campus divided by disruption, Tessa pleaded with UCSB to protect her from this ongoing assault, and to act in accordance with the express terms of its own anti-discrimination policy.  Tessa did so not as a Jewish UCSB student, but as UCSB's popularly-elected student body president, seeking to maintain civil discourse on campus - including at the University's Multi-Cultural Center ("MCC"), the very same venue at which these protestors purported to ban Zionist students.

6.     Despite being fully aware that its student body president was the subject of an ongoing and nakedly antisemitic campaign of assaults and other abuse, UCSB refused to assist.  But beyond mere inertia, the administration frequently

went out of its way to excuse this systemic assault of Tessa, grossly distorting the ongoing harassment as "valid criticism of a "political figure," when in fact Tessa was a UCSB student entitled to the same protections as her peers – and, specifically, the protections of the University's anti-discrimination policy, which the administration was ignoring.

7.    Then, on one occasion and in what can only be described as a descent into the surreal, a UCSB representative – donning a face mask, as were many of the agitators – expressed solidarity with a group of Tessa's antisemitic abusers in the campus MCC.  Tessa had approached the crowd on her own in an effort to speak with them in a civilized manner, only to be met with ongoing verbal assaults.  And this masked UCSB representative chose to actively side with those assaulting Tessa, in an obvious attempt to silence her.

8.    So sustained was the agitators' assault and other abuse – coupled with UCSB's indifference to her plight, punctuated by its sometimes vocal encouragement – that Tessa was ultimately forced to avoid large swaths of the UCSB campus throughout the 2023-2024 school year, unable to receive the full education that had in the first place brought her to the University.

9.    Why had UCSB crossed the threshold from "do nothing" to collaborator?  Because in the wake of October 7, it was more important to UCSB to placate – even if that mean encouraging – antisemitism, than to incur the mob's wrath by protecting the safety and speech of its popularly-elected student leader.

10.    With UCSB having failed at any time to do the obviously right thing, Tessa – now an alumnus – brings this action to hold UCSB accountable for:

● collaborating with the antisemitic protestors against Tessa, in violation of UCSB's obligations to protect her physical safety and her freedom from harassment;

● spurning Tessa's request for protection and assistance in response to these antisemitic threats and attacks directed at Tessa's First Amendment-

protected speech;

● failing to protect civil on-campus discourse, in contradiction to the central tenets of its anti-discrimination policy forbidding precisely such religious-focused abuse; and

● refusing to enable Tessa to receive the education she had paid to receive.

11. The damages Tessa suffered as a result of UCSB's unlawful failures and collaboration against her with antisemitic campus mobs are deep and ongoing. Beyond being deprived of part of the education she paid UCSB to receive, Tessa endured and continues to suffer excruciating trauma - including post-traumatic stress disorder - from the specter of entirely preventable physical violence, which but for UCSB's actions she faced directly and repeatedly.

## **JURISDICTION**

12. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts a federal cause of action alleging religious discrimination.

13. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Plaintiff resided in this District during the relevant time period, was affected by Defendants' unlawful policies and procedures within the District, Defendants' are domiciled for purposes of this lawsuit within this district, and Defendants' alleged actions or omissions occurred within the District. Thus, a substantial part of the acts or omissions that give rise to the claims asserted herein occurred within this District.

14. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, and 42 U.S.C. § 2000d et. seq.

## **PARTIES**

15. Plaintiff Tessa Veksler is an individual who resides in New York, New York.

16.     Defendant Regents of the University of California is a public agency within the meaning of California Government Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California.

17.     Defendant University of California, Santa Barbara, is a public university founded by the California State Assembly and operated by the State of California.

18.     On information and belief, Defendant DOE 1 is an agent, employee, and/or representative of Defendant University of California at Santa Barbara and is sued in their individual.  At all relevant times, DOE 1 was acting within the course and scope of their employment, and were acting under color of state law.  The identity and particular capacity of DOE 1 is presently unknown to Plaintiff. Plaintiff therefore sues this defendant by a fictitious name. Plaintiff is informed and believes and therefore alleges that DOE 1 was responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by said defendant. Plaintiff will amend the Complaint to substitute the true names and capacities of DOE 1 when ascertained.

19.     Defendants DOES 2 through 20 are the agents, employees, and/or representatives of the other named Defendants and, at all relevant times, acted within the scope of their agency or employment when they engaged in the conduct described in this complaint.  At all relevant times, DOES 2 through 20 were acting within the course and scope of their employment, and were acting under color of state law. The identities and particular capacities of DOES 2 through 20 are presently unknown to Plaintiffs. Plaintiffs therefore sue these defendants by fictitious names. Plaintiffs are informed and believe and therefore allege that DOES 2 through 20 were responsible in some manner for the occurrences herein alleged, and that Plaintiffs' injuries as herein alleged were proximately caused by said

1    defendants. Plaintiffs will amend the Complaint to substitute the true names and

2    capacities of DOES 2 through 20 when ascertained.

3    **GENERAL ALLEGATIONS**

4    **A.     Tessa's Background of Activism and Community Involvement.**

5    20.     Tessa is a first generation American whose parents emigrated from

6    Ukraine in the 1990s to the San Francisco Bay Area in order to allow their children

7    to build better lives in the United States.  Tessa has seized that opportunity, both to

8    experience the world and devote time and energy to her community and those

9    around her.  That included forming the first Jewish Student Union at her high school

10   and, immediately after graduation, attending a gap year program at Bar Ilan

11   University in Israel.  That program began in the Fall 2020 semester and intersected

12   with the height of the COVID-19 pandemic.  Tessa had planned to stay in Israel for

13   only that initial semester, and begin her freshman year at UCSB – where she

14   deferred her admission by one semester – in January 2021.  She stayed two

15   semesters in Israel, despite her classes at UCSB beginning as planned at the outset

16   of that second semester.  But ever the industrious student, Tessa juggled classes at

17   both institutions through the magic of Zoom and the 10-hour time difference

18   between Tel Aviv and Santa Barbara – she attended Bar Ilan classes from 8 in the

19   morning to mid-afternoon, and went online again to attend UCSB classes from 10 in

20   the evening until the early hours of the morning.

21   21.     Tessa arrived on the UCSB campus in Fall 2021 and, while excelling

22   academically, soon found herself back to activism.  She took a job working for the

23   then-president of the student body, and the experience piqued her interest in student

24   government.  By the following year she had been elected to the student Senate, and

25   immediately found opportunities to help her fellow students.  She served as the

26   College of Letters & Science Senator, and chaired the student government's Basic

27   Needs Committee – which focused on such foundational issues as food security

28   among UCSB students and the local community.  But the issue that hit closest to

home was the 2022 Russian invasion of Ukraine, her family's former home. Tessa explained in a May 24, 2023 article for The Algemeiner the visceral effect the conflict had on her, as one of a small number of Ukrainian students at UCSB: "When the conflict started, I was one of the only Ukrainian students within student government, and so many students turned to me for advice." She continued: "In working to help international students in Ukraine I realized how very few resources were available and that the ones that were available were not well known."

22.    So it continued for Tessa, this urge to help other students and to serve the campus community. Her experience with basic needs and assisting Ukrainian students – Jewish and non-Jewish – compelled her to run for student body president. She was elected to the position in April 2023, and resolved to devote her term to improving the lot of the entire student body. She summarized her outlook in a post on the student president's website in May 2023, expressing her plain focus on the secular nature of the position. The message noted the importance of "collaboration and open-mindedness" and her commitment to the "proactive inclusion of diverse student voices at the forefront of my presidency." There was not a mention of her Jewish faith, nor a suggestion that her religious observance would deter her from helping all students of all backgrounds.

23.    Nor were these mere slogans, or words. These were organizing principles for Tessa, and she was determined to embody them as she discharged her duties. Then came October 7, 2023, and everything changed.

**B.    Tessa Expresses Personal Support for Israel on her Personal Instagram Account**

24.    The savagery of Hamas' October 7 terrorist attacks in Israel is well documented, and need not be recited here. But for Tessa, this was a deeply personal event, as it was for the Jewish people worldwide. And like so many across the globe, she took to social media on October 8 to express her sadness for and solidarity with Israel and its people. She did not do so as the president of the UCSB

student body, nor did her post suggest she was expressing anything other than her personal views.  And those views were hardly provocative or divisive.  She principally recited the facts – the event was the deadliest terror attack since September 11 and the largest massacre of Jews since the Holocaust.  She further made clear that the Jewish community would not forget October 7, 2023 and, to further state the obvious, "[t]he murder of civilians, raping of women, kidnapping of children, is not and never will be justifiable."  And she emphasized her solidarity with her Jewish community and neighbors, and with the people of Israel.  And in perhaps the most telling and prophetic of her comments, Tessa observed that "[b]eing a Jewish student on a college campus should not be a safety hazard."

25.    Were that only the case at UCSB in 2023.  Tessa's statement was nothing more than an exercise her basic rights of free speech, and that fact is particularly germane because both the UCSB student body and the institution maintain written constitutions and policies that should have protected Tessa from any retribution resulting from her exercise of that basic right.  Indeed, free speech and anti-discrimination rights are ingrained in the UCSB's student constitution.  The "Student Bill of Rights" at Article II of that constitution expressly entitles "all students shall have the right to the freedom of speech and expression."  The Bill of Rights goes on to protect the "right to be free from violence on this campus," the right "to be free of unwarranted aggression during protests,"  and the "right to be free from discrimination and harassment on the basis of race, gender, sex, ethnicity, national origin, disability, sexual orientation, status within or outside the university, or political belief in all activities sponsored or conducted by the University."

**C.    The UCSB Anti-Discrimination Policy That Should Have Protected Tessa's Right to Express Her Support for Israel And Perform Her Secular Duties Without Being Harassed**

26.     The UCSB, for its part, maintains an elaborate – and at least facially strict – anti-discrimination policy that purportedly "addresses the University's

*responsibilities* and procedures related to Discrimination, Harassment, and Retaliation." That Policy defines harassment as any "[u]nwelcome conduct based on an individual's actual or perceived Protected Category that is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, denies, or adversely limits an individual's participation in or benefit from the education, employment, or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive." Unsurprisingly, religion is expressly included within the definition of Protected Category. Policy, Sections II(A)(1) and (B)(5). Discrimination, in turn, is similarly defined as an "Unwelcome Action" taken because of an individual's actual or Perceived Protected Category." Lest there be any doubt, the Policy explicitly covers "acts of Prohibited Conduct by University Students." Policy, Section III(B).

27. The supposed depths of protection for students like Tessa don't end there. Section III(E) of the Policy takes pains to note that UCSB "students of the University enjoy significant free speech protections guaranteed by the First Amendment of the United States Constitution and Article I, Section II of the California Constitution." But, it continues, "freedom of speech and academic freedom are not limitless and, for example, do not protect speech or expressive conduct that violates federal or state anti-discrimination laws."

28. The Policy finally imposes – or facially imposes – strict requirements on UCSB administrators to investigate claims or harassment and take remedial measures to redress them. That specifically includes: (1) initiating an investigation as soon as a report of harassment or discrimination is received; (2) empowering the institution to facilitate a resolution process if it deems it productive; (3) conducting a formal investigation in the event no informal resolution is feasible; (4) the right and indeed the expectation that the investigation will include interviews with the complainant and relevant witnesses; and (5) the right and obligation on UCSB's part to initiate an investigation with or without a complainant where information

furnished indicated "an ongoing threat to the University community," or a pattern of alleged conduct toward multiple people by the same Respondent that would, in the aggregate, constitute Prohibited Conduct."   And where the investigation reveals Prohibited Conduct – such as religious discrimination and harassment – the Policy demands that the UCSB "take prompt and effective steps reasonably calculated to stop the violation, prevent its recurrence and, as appropriate, remedy its effects."

29.    That is, the UCSB anointed itself the power and responsibility to redress religious discrimination on campus, and it extended itself expansive power and authority to investigate that discrimination, weed it out, and punish those responsible for it.  All very impressive sounding, and indeed the infrastructure of the Policy is comprehensive and elaborate.  But when it came to Tessa, and the ugly and venomous antisemitism campaign directed at her, the entire content of the Policy proved little more than empty words that the UCSB ignored and, in its affirmative conduct, defied.  And that made Tessa a two-time victim – once, as she faced the maelstrom of attacks from Antisemitic student protestors, and a second time when the University disregarded the threats to and harassment of her and then tacitly – and ultimately actively – supported that harassment.

**D.    The Antisemitism, Harassment, Abuse and Discrimination to which Tessa Was Subjected, And That UCSB Tacitly and Actively Supported**

30.    The Orwellian vortex in which Tessa found herself in late 2023 and 2024 cannot be adequately conveyed in mere words, but the sheer scope and discriminatory animus of the protestors – and the University's complicity, through both omission and commission – can at least be chronologized in detail.  And it began almost immediately after Tessa's innocuous October 8, 2023 Instagram post.

31.    A group of Antisemitic and anti-Israel UCSB students began a relentless campaign of harassment against her, and transparently targeted her on the basis of her Jewish shared ancestral identity.  The manner in which Tessa was

targeted reflects not simply a menacing attitude toward her individually, but a pattern of mistreatment that Jewish students were and are facing on college campuses across the country when they express aspects of their religious identity. With increasing frequency, Jewish college and university students are being harassed and intimidated due to the Jewish people's connection to Israel. Students report being shunned and marginalized as "Zionists." The U.S. National Strategy to Counter Antisemitism, released in May 2023, noted that "Jewish students and educators are targeted for derision and exclusion on college campuses, often because of their real or perceived views about the State of Israel. When Jews are targeted because of their beliefs or their identity, when Israel is singled out because of anti-Jewish hatred, that is antisemitism. And that is unacceptable." According to the International Holocaust Remembrance Alliance Working Definition of Antisemitism (the "IHRA Definition"), "[h]olding Jews collectively responsible for actions of the state of Israel" is an example of antisemitism.

32.     The UCSB practiced that antisemitism, with gusto, in 2023-2024 and at the cost of Tessa's personal safety, mental health, and education.  The campaign began online, and within days of Tessa's October 8 post.  Tessa was accused of supporting genocide, and subjected to base and sordid antisemitic tropes.  Nor did time temper the venom of the protestors or their targeting of Tessa.  There was a steady diet of tired and well-worn antisemitic favorites questioning Tessa's basic loyalties and right to serve in her position.  One public Instagram story post on December 25, 2023, for example, left little to the discriminatory imagination: "she's accomplished nothing besides promote Israeli propaganda...we want her out of AS [Associated Students]. call her Zionist ass out!!!!!!!!" Another message, posted on or about December 28, 2023 blamed Tessa for the actions of Israel – a common indicator of antisemitism – as justification for her ousting, stating: "you nearly singlehandedly enforce the zionist (terrorist) aggression on this campus...@tessaveksler RESIGN NOW. RESIGN NOW. RESIGN NOW."

33.    The passage of time only fueled the harassers' appetite for abuse.  On February 25 and 26, 2024, students posted signs throughout the MCC where Tessa's student government office was located, threatening her and making it clear she was unwelcome on campus and should be excluded because she is "a Zionist." The messages on various posters were uniform in their venom and menace: "Zionists are not welcome," "Zionists not welcome," and "Ziofascists GTFO [get the fuck out]."

34.    Indeed, among the most chilling elements of this desultory affair was the obvious desire of the harassers and intimidators to express their antisemitic fervor *publicly and explicitly*.  There were no veiled suggestions or metaphorical tropes, and they wanted no room for interpretation or doubt – their hatred of Tessa was based solely on her status as a Jew, and they wanted the entire world to know it. Thus, indulging their appetite for attention – but confirming that irony was lost on them – the protestors plastered signs in the campus *Multi-Cultural Center* declaring that the center did not welcome students of one cultural background: "Zionists are not welcomed."  Fueling the fire, UCSB's official MCC Instagram account

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1   spotlighting the signage on the MCC doors with a comment stating "in case we
2   aren't clear, let us spell it out."

3          35.      Tessa faced this harassment on a daily basis, and it wasn't merely the
4   relentless assault on social media or the mounting threats to her safety.  Indeed, in
5   her determination to fulfil her secular duty as student body president, she routinely
6   went to her office in order to be accessible to her fellow students.  But that office
7   was immediately adjacent to the MCC, and she was thus forced to walk past the
8   myriad signs expressing hatred of her as she was laboring to do her job on behalf of,




among others, the very student authoring those toxic and antisemitic messages.

36.     The vehemence of protestors' untethered rhetoric did not, however, deter Tessa from her commitment to the inclusion of diverse student voices—a commitment made in her initial May 2023 message as student body president—and to increase understanding among the Antisemitic Protestors and the Jewish students that were the subject of the protestors' relentless threats and animosity.  She thus visited the MCC with a group of students on February 26, 2024, in an effort to open up dialogue with the protestors and, Tessa hoped, to lower the already boiling temperature on campus.  No such luck—a group of students hung up additional harassing posters while Tessa was present, with messages such as: "AS president is racist Zionist," and "Get these Zionists out of office."  Even more ominous, some of the posters threatened Tessa directly: "You can run but you can't hide Tessa Veksler," and "you cannot hide."

37.     Things only got worse.  The same day, Tessa's fellow students posted still more demeaning messages and issued veiled threats on social media: "You are disgusting. Zionists are NOT welcome in the MCC. We will not back down and we WILL take action;" and "PLZ [sic] GO. WE DONT LIKE ZIONISTS." Students referred to Ms. Veksler as a "Zionist dog."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19





20    38.    There was no bottom to the depths of the hatred directed at Tessa.  One

21  particularly vulgar post about her read "fuck your white comfort in stealing a

22  multicultural center".  That the campus multi-cultural center exists to accommodate

23  the diverse interests of *all UCSB students* was an irrelevance to the harassers.  The

24  point was to ostracize and intimidate Tessa.

25    39.    It didn't end merely with posts and threats.  One student posted

26  Tessa's private telephone number on Instagram—a process called doxxing—on

27  March 5, 2024.  That information, now public, heightened the harassment of risk to

28  Tessa.

40.     The campaign marched on, and the messages came fast and furious.  A post on March 6, 2024, revived the accusation of Tessa's dual-loyalties and, perhaps inevitably, indulging in the age-old claim of a worldwide Jewish financial conspiracy: "Tessa is being funded by a foreign government ... to... line her pockets for clout," thereby insinuating that, as a Jew, Tessa is an agent of and beholden to the interests of the Israeli government.

41.     The harassment continued.  On or about April 9, 2024, a student government poster with Tessa's image that was hanging at the University Center on campus was vandalized. The poster featured photographs of several members of the student government including Tessa, but only her photograph was slashed. This violent act was a concerning escalation of the targeted harassment directed at Tessa over the course of seven months and heightened her safety concerns on campus.



-17-
COMPLAINT

### E.    The Recall Campaign

42.    Tessa's tormentors were not satisfied merely with threatening and relentlessly harassing her.  They increased the intensity of their campaign in March 2024, releasing a petition to have her recalled as student body president.  The petition itself stated no reason for Tessa to be removed from office, but an Instagram account under username @recalltessaveksler posted the perverted and purported justification for the move: "Under UCSB A.S. President Tessa Veksler's [reign], we have seen unprecedented levels of division and tension on campus. Her inflammatory rhetoric has directly contributed to the rise in bullying, intimidation, and harassment of students."

43.    Welcome to the Mad Hatter's Tea Party, where the perpetrators of a campaign of threats and harassment accuse the victim of causing tension and division, all while ignoring the vitriol hurled at that victim publicly, and for months. All apparently because Tessa expressed support for Israel in the wake of a heinous terrorist attack that took the lives of over a thousand innocent Israelis.

44.    The hypocrisy of the petition mattered not to the harassers, who were determined to push forward in the effort to further target and embarrass Tessa.  Nor, apparently, did it matter to UCSB administrators, who persisted in their full throated embrace of the campaign against Tessa.  Thus, for example, Tessa attended a student-led Elections Board meeting in March 2024 that, among other things, was convened to address whether to move forward on the Petition.  But when the meeting turned to the Petition, the student-led Board – under the watchful eye of the Administrator and Executive Director of Associated Students – insisted that Tessa be removed from the meeting.  The Administrator did nothing while Tessa was then excluded from the discussion of the future of a Petition directed at her and which contravened UCSB's Policy.

45.    The petition ultimately was heard and voted upon at an April 10, 2024 meeting of the student Senate.  The hearing quickly dissolved into an hours-long

litany of insults, false accusations, and further harassment of Tessa, all of which she endured in person.  When she was finally given a chance to speak in her own defense, the assembled harassers in the crowd shouted, laughed and smirked.

46.    The petition failed.  But the effect on Tessa was profound.  She felt devastated by the feeling that so many of her fellow students – those students she represented and for whom she advocated –had such a deep hatred for her, and that she was apparently powerless to change it.  She struggled to eat, she slept poorly, and isolated herself even from friends and family. She even considered resigning her position, but quickly resolved that she would not surrender to the forces that were harassing her.

**F.**    **UCSB Had Knowledge of the Severe and Persistent Antisemitic Harassment Directed at Tessa, but Failed to Take Prompt and Effective Steps to Stop it or Address the Hostile Environment**

47.    All of these threats and this harassment took place under the watchful eye of the University and its administrators. But the UCSB did nothing, despite its elaborate anti-discrimination Policy and Tessa's repeated pleas for help.

48.    The harassment to which Tessa was subjected, and its harmful impact on her, was a matter of common knowledge to the University and, indeed, Tessa had contacted administrators throughout the weeks after it began and grew more tenacious and threatening.  And she formally complained to administrators on or about December 10, 2023.  The Policy required an immediate investigation, but the University's Office of Equal Opportunity and Discrimination Prevention couldn't muster the energy even to respond for weeks. And the eventual response was patently anemic – the University referenced more recent events at the MCC and said it was removing unapproved messages "from locations that are not approved for messages of any kind."  That is, posters would be removed from locations that prohibited signage of any kind, but nothing would be done to redress the seemingly endless array of threatening posters in, for example, the MCC – all directed at Tessa.

Nor was there any indication that the University had undertaken meaningful action after Tessa's formal complaint on December 10 to address the systematic harassment of Tessa based on her Jewish identity. The harassment was plainly "prohibited activity" under the Policy, and Tessa's exercise of religion and speech were both expressly protected categories under Section II. And yet the University sat idle, content to allow Tessa to dangle in the antisemitic wind. It wasn't for a lack of trying on her part, She pleaded with the University to protect her from the negative impact the harassment had on her mental health, academics, and ability to lead the student body as their president.

49. But it gets worse, if that's possible. The Policy demanded that UCSB "take prompt and effective steps reasonably calculated to stop the violation, prevent its recurrence and, as appropriate, remedy its effects." But rather than fulfil the obligations it set for itself, or even simply condemn the harassment, UCCSB deliberately allowed it to continue and compound. But one example of that official complicity and participation was the UCSB MCC's official Instagram page posting images of signs declaring "Zionists are not welcomed" at the Center – as alleged above.

50. The ultimate insult on top of injury came when a UCSB representative even **participated** in the harassment. Tessa, in February 2024, entered the MCC to address a group of Antisemitic protestors and attempt to initiate a dialogue with them – a dialogue aimed at increasing understanding, not polemical or confrontational. Many of the protestors wore masks or keffiyeh scarves to hide their identity. Tessa did not. But she spoke directly with the group, calmly and graciously, all in an effort to come to a place of mutual understanding and respect. And she believed she was making progress until a UCSB representative – defendant Doe 1, and also wearing a mask – joined the meeting and began harassing Tessa and purposefully inciting the crowd's antisemitic animus toward Tessa. The representative, for example, repeatedly interrupted Tessa and asked the protestors

whether she (Tessa) was upsetting them, or making them feel uncomfortable. That toxic involvement accomplished the representative's apparent goal – the protestors became agitated and aggressive toward Tessa, and her efforts at conciliation went for naught.

51.    The UCSB took other affirmative steps that served to deepen the damage to Tessa. A Faculty Group called Academics for Justice in Palestine actively met with student groups and refused to condemn the threatening and harassing signs posted about Tessa and described and displayed above. The University did nothing as its own faculty all but apologized for the antisemitic venom directed at Tessa. And, when the recall petition was issued in March 2024 the UCSB administration intervened and forced the then-Attorney General of the student government to keep the ongoing recall petition confidential from Tessa, effectively silencing her and preventing her from being able to defend herself until the petition had essentially been brought to fruition. She literally had to attend the student Senate hearing on April 10, 2024 in order to hear the "charges" against her – which, it turned out, amounted to the same litany of insults and threats to which she had been subjected for months.

52.    Nor is that the end of UCSB's complicity and participation. Several administrators were informed of a transparently threatening and hateful open letter directed at Tessa which was printed and posted throughout UCSB's campus. Although they were very much aware of this letter, they took so much time to take down the letter that they themselves acknowledged it, but the damage was already done. After Tessa complained to campus administration, the removal of these posters should have been a top priority. The posters were a repetition of the seemingly endless and baseless accusations against Tessa – that she supported genocide and an apologist for war crimes, etc. etc. – and they served only to inflame the ongoing assaults on Tessa. But just as alarming, when Tessa raised the issue by text directly with two UCSB representatives at the highest level of the University's

administration – the Vice Chancellor of Student Affairs and the Dean of Student
Life – and expressed urgency in asking that the posters be removed, UCSB again
retreated into accommodation of the antisemitic mob.  The excuse for delaying their
removal?  The posters were "pasted" on poles and other locations and consequently
"facilities" needed to be contacted in order to remove them.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



23  ///

24  ///

25  ///

26  ///

27  ///

28  ///





53.    This was simply more of the same.  And the assault and abuse of Tessa continued, forcing her to stay off campus and miss classes, all because she was too afraid to set foot on vast segments of UCSB's grounds.  The administrators were aware of the damage being done to Tessam and yet chose essentially to ignore it.

54.    The University's obvious predisposition to accommodate the antisemitic protestors threatening Tessa was apparent in its February 26, 2024 statement to the community purporting to address the situation. This was 5 months

after the harassment began and more than 2 months after Tessa's December 10 email.  It presumably came in part because the harassment had escalated at the MCC, which compelled the institution to say *something*.

55.    It didn't say much.  The February 26 statement failed to mention or condemn the anti-Jewish hostility and targeted harassment of Tessa, as well as the exclusion of Jews from the MCC on the basis of shared ancestry connected to Israel. Moreover, the statement failed to acknowledge and denounce the harassment at the MCC as an escalation and continuation of the targeted campaign targeting Tessa – one that had been ongoing for over 5 months.

56.    Tessa did not file any allegations through the University's internal grievance procedures regarding the harassment of her – including the events at the MCC.  But the University nevertheless contended it was conducting a bias incident review of the incidents at the MCC – an investigation that was required in any event under the anti-Discrimination Policy.  That investigation was plainly nothing more than a synthetic artifice, because no meaningful findings have ever been published and UCSB has taken no steps to rectify the egregious and discriminatory mistreatment of Tessa at the hands of her fellow students and the administration and faculty.  The University, in short, abandoned Tessa to the antisemitic mob, discarded its own written Policy intended to prevent that harassment, and allowed and facilitated an insidious injustice to continue unabated.

**G.    Tessa Has Been Harmed By Relentless Bullying and Harassment From her Peers on the UCSB Campus**

57.    The damage to Tessa is, predictably, severe and continuing.  Months of being harassed, threatened and shunned had caused her to fear for her safety on campus, negatively impacted her mental health, adversely affected her academic experience and ability to enjoy the benefits of the education she paid for, and undermined her ability to lead the student body as student government president. Tessa suffered from panic attacks as a result of the threats and harassment against

her.  Ultimately, and to avoid the harassment and hostile environment, she was forced to stay off campus during the winter semester final exam period and had to take her exams online instead of in-person on campus like the rest of her peers. The April 9 incident, when her publicly displayed photograph was vandalized, made Tessa feel even more frightened for her safety and well-being on campus.

58.    No legal action can shelter Tessa from the implications of this campaign of terror.  Nor can compensation replace the contentment and peace of mind she was denied.  But the University must be responsible for its actions, or others like Tessa will be victimized in the future.  Hence, this lawsuit to hold the University accountable.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983 – Violation of the Equal Protection Clause)
### Against Defendants DOE 1, and Does 2-20

59.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

60.    Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

61.    Defendants have deprived Plaintiff of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiff differently than similarly situated individuals because Plaintiff is Jewish. Specifically, Defendants selectively chose not to stop public harassment and threats of violence against Tessa specifically because of her Jewish heritage.

62.    Defendants intentionally chose not to enforce the school's policies in an evenhanded way, resulting in rampant, unchecked harassment against Tessa by UCSB students on and off the UCSB campus.

63.    As a result of Defendants' actions, Plaintiff has suffered significant injuries.

64.    Defendants have no overriding or legitimate state interest, let alone a compelling one, to justify their decision to allow one of its students to be subjected to months of harassment and threats of physical violence. Even if such an interest existed, Defendants have failed to narrowly tailor their action to serve such an interest.

## SECOND CAUSE OF ACTION

### (Violation of Title VI of the Civil Rights Act of 1964)

### Against Defendants Regents of the University of California and University of California, Santa Barbara

65.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

66.    Defendants UCSB and the Regents of the University of California receive financial assistance from the U.S. Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

67.    Discrimination against Jews is prohibited under Title VI of the Civil Rights Act of 1964, as reflected in the written policies of the Department of Education's Office for Civil Rights. See e.g., U.S. Dep't of Educ., OCR Dear Colleague Letter: Addressing Discrimination Against Jewish Students (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf; U.S. Dep't of Educ., OCR-000127, Questions and Answers on Executive Order 13,899 (Jan. 19, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf; U.S. Dep't of Educ., OCR-00107, Dear Colleague Letter: Combatting Discrimination Against Jewish Students (2017), https://www2.ed.gov/about/offices/list/ocr/docs/jewish-factsheet-201701.pdf; Letter from Thomas Perez, Asst. Att. Gen., Civ. Rts. Div., U.S. Dep't of Justice to Russlyn Ali, Asst. Sec'y for Civ. Rts., OCR, U.S. Dep't of Educ. Re: Title VI and Coverage of Religiously Identifiable Groups (Sept. 8, 2010), https://www.justice.gov/sites/default/files/crt/legacy/2011/05/04/090810_AAG_Pere

z_Letter_to_Ed_OCR_Title%20VI_and_Religiously_Identifiable_Groups.pdf; U.S. Dep't of Educ., OCR Dear Colleague Letter: Religious Discrimination (Sept. 23, 2004), https://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

68.    On November 7, 2023 OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . . Harassing conduct can be verbal or physical and need not be directed at a particular individual. U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

69.    OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id*. And it repeats its longstanding admonition that "[s]chools must take immediate and effective action to respond to harassment that creates a hostile environment." *Id*.

70.    Defendants' failure to enforce its policies in an evenhanded manner and prohibit its students from publicly harassing and threatening Tessa on and off UCSB's campus created an environment that is hostile towards Jews. The hostility

towards Jewish members of the UCSB community was severe enough that it interfered with their ability to participate in the programs and activities of the school, including by forcing Tessa, out of fear for her safety, to take final exams off campus instead of in person.

71.     While on notice of the discrimination against and hostile environment for Jewish members of the community (as shown by their public statements), including that aimed at Ms. Veksler, Defendants failed to take corrective action.

### THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983 – Violation of the Free Exercise Clause)

### Against DOE 1, and Does 2 through 20

72.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

73.     The Free Exercise Clause "protect[s] religious observers against unequal treatment" "based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

74.     Defendants deprived Plaintiff of the free exercise of her religion, as secured by the First Amendment, through policies and practices that subjected Plaintiff to unequal treatment based on her religious status.

75.     Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

76.     Defendants failed to tailor their actions narrowly to serve any such interest.

77.     As a result of Defendants' actions, Plaintiff has been injured by losing equal access to educational opportunities at UCSB, losing access to UCSB facilities, losing in-person learning and test-taking opportunities, being denied equal participation in the life of the university, suffering emotional and physical stress that diverted time, attention, and focus away from her studies, and by other harms.

78.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief against the Defendants as follows:

a.    For statutory damages and treble damages as allowed by Cal. Civ. Code § 52.1;

b.    For compensatory damages in an amount according to proof;

c.    For pre-judgment interest on all damages awarded by this Court;

d.    For reasonable attorneys' fees and costs of suit incurred herein; and

e.    For such other and further relief as this Court deems just and proper.

DATED: December 11, 2025    ELLIS GEORGE LLP
Eric M. George
Todd M. Lander
David J. Carroll

By: _____
Todd M. Lander
Attorneys for Plaintiff Tessa Veksler

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

/ / /
/ / /
/ / /
/ / /
/ / /

1    DATED: December 11, 2025          ELLIS GEORGE LLP
2                                              Eric M. George
                                                Todd M. Lander
3                                              David J. Carroll
4
5                                      By: _____
6                                                  Todd M. Lander
                                            Attorneys for Plaintiff Tessa Veksler
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28